Argued January 11; reversed February 8; rehearing denied and
opinion modified March 14, 1944

# UNION PACIFIC RAILROAD CO. *v.* UTTERBACK
### ET AL.
# UNION PACIFIC RAILROAD CO. *v.* THATCHER
### (146 P. (2d) 76, 769)

Before BAILEY, Chief Justice, and BELT, ROSSMAN, KELLY, LUSK, BRAND and HAY, Associate Justices.

*George Mowry,* of Portland (John Mowry, of Portland, on the brief) for applellant and for the within named guardian *ad litem* and for said minor appellants.

*Roy F. Shields,* of Portland (W. H. Morrison, Robert F. Maguire, Shields, Morrison & Biggs, all of Portland, on the brief), for respondent.

KELLY, J. These two cases were argued together and they will be so treated here. The question presented is whether in view of the admitted facts in this record the Circuit Court of the State of Oregon for Multnomah County may enjoin the continuance of litigation against plaintiff, an interstate carrier, which litigation was instituted pursuant to and based upon the provisions of the Federal Employers' Liability Act, and is pending in the Superior Court of the State of California for Los Angeles.

At all times herein mentioned, plaintiff, a corporation organized and incorporated under the laws of Utah, has been and is engaged in the operation of a railroad system as a common carrier subject to the Interstate Commerce Act and operating many main and branch lines of railroad whereby it transports passengers, freight, mail and express within and between the state of Oregon and other states, it being conceded during oral argument that at all times involved herein plaintiff maintained offices, operated one part of its railroad system and was engaged in doing business as a common carrier in Los Angeles County, California.

These cases come to us upon demurrer to the complaints, which were overruled by the trial court and upon which defendants elected to stand. The facts, therefore, are to be found in the complaints.

As shown by plaintiffs' complaints herein, the salient facts are as follows:

On February 7, 1942, Alfred Martin Thatcher was employed by plaintiff herein as a conductor, and Harold Patrick Utterback was employed by plaintiff as a fireman and both were working as members of the crew of plaintiff's train No. Extra 2521, which at said time was stopped upon a siding in plaintiff's yards in or near the city of Portland, Multnomah County, Oregon. Thatcher was in and about the locomotive and Utterback was in the cab of the locomotive of plaintiff's train No. Extra 2521 when another train proceeding on an adjacent track of plaintiff became derailed and collided with and struck the first mentioned locomotive causing it to turn over and fall upon Thatcher and Utterback resulting in fatal injuries to them. Thatcher left no lineal descendants. His widow, Lila B. Thatcher,

survived him and nominated Charlotte E. Leet to act as administratrix of the estate of her late husband. Utterback was survived by his widow Annabelle C. Utterback, his minor son William Richard Utterback and his minor daughter Marjorie E. Utterback. Mrs. Utterback also nominated Charlotte E. Leet to act as administratrix of the estate of her late husband. Pursuant to the nomination aforesaid, and upon the petitions of Charlotte E. Leet therefor, respective orders were made by the Superior Court of the State of California in and for the County of Los Angeles appointing said Charlotte E. Leet administratrix of the estates of said Alfred Martin Thatcher, deceased, and Harold Patrick Utterback, deceased, respectively. Thereafter, on April 27, 1942, defendants herein caused respective civil actions to be instituted by said Charlotte E. Leet, administratrix, in said Superior Court of the State of California for the enforcement of their claims respectively against plaintiff herein.

Plaintiff herein claims that an investigation of the facts disclosed that the accident resulting in the deaths of Thatcher and Utterback did not result from any negligence on plaintiff's part and that to present its defense at the trials of the cases in California plaintiff would be required to produce as witnesses the six members of the train crew on westbound freight train "2d 255"; three members of the train crew on said eastbound freight train "Extra 2521 East" all of whom reside in Portland and are regularly employed in the operation of plaintiff's trains; one rear brakeman on said train "Extra 2521 East", who resides at The Dalles, Oregon, and is now regularly employed in the operation of plaintiff's freight trains; two or more members of the six men train crew on plaintiff's west-

bound freight train "First 255", which passed over said tracks a few minutes prior to said accident, all of whom reside in or near Portland, Oregon, and are regularly employed by plaintiff in the operation of plaintiff's freight trains; one section foreman and two section hands, who reside near Hemlock, a few miles east of Portland, Oregon, one roadmaster residing in Portland, Oregon, one of plaintiff's former roadmasters, who still resides in Portland, Oregon, one of plaintiff's present roadmasters, who now resides in Seattle, Washington, plaintiff's district engineer of its northwestern district, who resides in Portland, Oregon; plaintiff's present general manager for said northwestern district, who resides and maintains his headquarters in Portland, Oregon, and plaintiff's master mechanic for its Oregon division, who resides in Portland, Oregon.

Each of the above mentioned witnesses would testify to pertinent and relevant facts tending to show entire lack of the alleged negligence on plaintiff's part in reference to the accident upon which the California cases aforesaid are based.

We quote further from plaintiff's complaints as follows:

"During present war conditions, and as an essential part of the present war activities of the United States and her allies, this plaintiff has been continuously ever since December 8, 1941, and is now engaged by direction of the Government of the United States, in transporting between points in the Pacific Northwest, and between that area and other parts of the country, large numbers of troops and vast quantities of vital war materials, equipment and supplies (herein called 'war traffic'), the prompt movement of which was and is essential to the defense of the United States and the safety

of its people, and to the successful prosecution of the present war against Japan, Germany, Italy and other axis powers. While disclosure of the exact character or volume of such war traffic is not permitted, plaintiff states generally that same substantially exceeds in volume the combined total of all other traffic now handled by this plaintiff, and that the amount of such war traffic has been and is now increasing from month to month. During the month of August, 1942, for example, plaintiff operated between Portland and The Dalles (where the employes mentioned in subparagraphs (a), (b), (c) and (d) of paragraph XIII of this complaint are employed) 180 eastbound freight trains and 211 westbound freight trains, all laden predominantly with war traffic. In addition plaintiff operated between Portland and The Dalles during the same period thirty-three 'Government special' trains carrying such war traffic exclusively. The total 424 freight trains so operated between Portland and The Dalles during that month amounted to an average of one every two hours, day and night. During the present month of September, 1942, plaintiff was required to operate between Portland and The Dalles more than 30 of such 'Government special' trains within one three-day period. The operating difficulties in handling that extraordinary volume of traffic was and is substantially increased by the fact that such traffic is predominantly westbound, which required the deadheading of many train crews eastward to handle the heavier westbound movement.

To handle such emergency war traffic as aforesaid, this plaintiff has been for sometime and now is compelled to use every available employe who has had any experience in the handling of trains or in the maintenance of tracks, roadbed or equipment; to require all such employes to work full time, most of them to work overtime, and some of them to work double shifts; to discontinue assignments of trainmen to particular freight trains and list all such trainmen in one 'pool' and draw men therefrom as

needed without regard to prior regular assignments; to seek additional new employes to carry on such work, and to that end to advertise through the press and otherwise for additional help; to waive many normal qualification requirements of new employes for such work; to accept and 'break in' for train service many new and inexperienced employes; to discontinue or curtail much of plaintiff's normal train service (particularly on branch lines) in order to conserve manpower and equipment for use in transporting such war traffic; and generally to subordinate all of plaintiff's normal railroad operations to the prompt movement of such essential war traffic. But notwithstanding all such effort, plaintiff has been and is unable to obtain an adequate number of employes qualified for train service to handle such war traffic with the dispatch desired and demanded by Government officers and by essential defense industries.

To keep said trains rolling, the tracks, roadbed facilities and equipment used in connection therewith must be constantly maintained in condition suitable for the safe and expeditious movement of such war traffic in great volume as aforesaid. Plaintiff has been and is required to use full time in such work every maintenance of way employee, every mechanic, and every experienced supervisory officer or additional help available.

Every employe mentioned in paragraph XIII above [this refers to the employes alleged to be material and necessary witnesses as above numerated] is properly qualified by training and experience for the work he is performing for plaintiff as aforesaid, and each of them is now and will be for an indefinite time in the future, urgently needed by this plaintiff in carrying on its said railroad operations. If plaintiff were to be deprived of the services of any of such employes for any period of time, some part of its said railroad operations would be correspondingly retarded; and if plaintiff were to lose the active service of any considerable number

of such employes for several days at a time, such loss would directly and seriously retard the movement of such emergency war traffic to the irreparable injury of the people and of the Government of the United States.

It is approximately 1,150 miles by railroad from Portland, Oregon, (where the great majority of this plaintiff's said employe-witnesses reside) to Los Angeles, California, where said California case is scheduled to be tried; and it requires between 34 hours (via Southern Pacific) and 47 hours (via Union Pacific) to travel by railroad from Portland to Los Angeles on normal passenger train schedules, and requires even longer to return from Los Angeles to Portland via either of said routes. To insure the presence of said employe-witnesses at the trial of said case in Los Angeles, they would have to arrive there not later than the morning of November 24, 1942 (the trial date fixed as aforesaid) although said Superior Court might be unable, because of docket congestion or for other reasons, to reach said case for a day or two or several days thereafter. Because of the impossibility of recalling any of such employe-witnesses after having once excused him and permitted him to return to Portland, plaintiff would be required to keep all of such employe-witnesses in Los Angeles until the close of such trial. By reason of the facts aforesaid, plaintiff estimates and therefore alleges that the use of any of its employes as a witness at the trial of said California case would require the absence of such employe from his work for a period of at least one week and probably longer. On the other hand, if said case were to be tried in Multnomah County, Oregon, where the cause of action arose, said employe-witnesses could be called as and when needed and none of them would have to be released from his regular work more than one day to enable him to testify in such action, and only a few of such employes would have to be so released on any one day.

Notwithstanding current governmental restrictions on the unnecessary use of passenger train service, all or substantially all of the passenger trains now operated between Portland and Los Angeles (via either Southern Pacific or Union Pacific) are carrying capacity loads; and to make room for such employe-witnesses in traveling to and from Los Angeles, a corresponding number of other passengers, some of whom may be required to travel by train in connection with important war activities, might have to be denied transportation on such trains or delayed in obtaining same.

The actual and necessary expense to this plaintiff of properly presenting its defense to said California action at the trial thereof in Los Angeles would be many times greater than the cost of such a trial at Portland, and would be unduly excessive and burdensome to the plaintiff, and ultimately to the public, and out of all proportion to the actual value of said claim. Such excessive cost, as well as the serious and unreasonable interference with plaintiff's transportation operations in defending itself in said California court as aforesaid, would constitute an undue and unreasonable burden upon interstate commerce during the present national crisis.''

In plaintiff's complaint, reference is made to fifty damage actions, including the two now under consideration, caused to be filed by Mr. Clifton Hildebrand, an attorney practicing in California, against railroad companies in superior courts of the state of California, between August 1, 1940, and September 1, 1942, to collect damages on account of personal injuries to, or death of, railroad employees in accidents occurring outside of California; and it is alleged that defendants herein, said Charlotte E. Leet and said Hildebrand conspired to institute the cases here involved in Los Angeles, California, more than 1,100

miles from the scene of said accident for the deliberate and wrongful purpose of taking an unfair advantage of plaintiff in the hope that thereby they might be able to exact from plaintiff either a grossly excessive amount in settlement of said case or a grossly excessive award of damages from a Los Angeles jury all in utter disregard of the effect of their action upon the safety and welfare of the general public.

The provision in the Federal Employers' Liability Act with regard to venue reads as follows:

"Under this chapter an action may be brought in a district court of the United States, in the district of the residence of the defendant, or in which the cause of action arose, or in which the defendant shall be doing business at the time of commencing such action. The jurisdiction of the courts of the United States under this chapter shall be concurrent with that of the courts of the several states, and no case arising under this chapter and brought in any state court of competent jurisdiction shall be removed to any court of the United States." 45 U. S. C. A. Sec. 56, 10A, F. C. A. Sec. 56, p. 170, 36 Stat. L. 291, Secs. 6 and 53 Stat. L. 1404.

■ As we understand the doctrine of *Baltimore & Ohio R. Co. v. Kepner,* 314 U. S. 44, 62 Sup. Ct. 6, 86 L. Ed. 28, 136 A. L. R. 1222, and *Miles et al. v. Illinois Cen. R. Co.,* 315 U. S. 698, 62 Sup. Ct. 827, 86 L. Ed. 1129, a state court cannot validly exercise its equitable jurisdiction to enjoin a resident of the state from prosecuting a cause of action arising under the Federal Employers' Liability Act where the act conferred venue on the ground that the prosecution in the court of the sister state is inequitable, vexatious and harassing to the carrier.

The defendants were at all times mentioned herein and are now citizens and residents of Multnomah County,

Oregon. While the actions instituted and pending in the Superior Court of California in and for the county of Los Angeles were instituted by the administratrix of the estates of the deceased persons, whose deaths are alleged to have been caused by the negligence of the employees of the Union Pacific Railroad Company, the defendant therein and the plaintiff herein, it is conceded that the defendants herein are the beneficiaries and the real parties in interest in the California cases; and that the plaintiff in said California cases, Charlotte E. Leet, is acting therein as agent and under the direction of defendants herein.

The plaintiff herein cites subdivision 8 of section 6 of the Interstate Commerce Act and urges that defendants herein, by prosecuting their damage claims in a remote forum during the present war crisis, placed the plaintiff in the dilemma of having to choose between (a) waiving its defenses to such damage claims, one for $100,000, the other for $50,000, which plaintiff believed to be without merit, or (b) violating its carrier obligations during this period of national peril and thus exposing itself to resulting penalties.

. Thus a controlling distinction is sought to be shown by plaintiff between the cases at bar on the one hand and *Baltimore & Ohio Railroad Company v. Kepner,* supra, and *Miles et al. v. Illinois Central Railroad Company,* supra, on the other. While the distinction is apparent that in the cases at bar the demands of the war effort are upon plaintiff and such was not the case in either of the two federal cases last mentioned, we are unable to concur with plaintiff that such distinction justifies an affirmance of the decrees of the trial court.

The pertinent provision of subdivision (8) of section 6 of the Interstate Commerce Act is as follows:

"In time of war or threatened war preference and precedence shall, upon demand of the President of the United States be given over all other traffic, for the transportation of troops and material of war, and carriers shall adopt every means within their control to facilitate and expedite the military traffic." 49 U. S. C. A. sec. 6, par. 8, 10-A, F. C. A. sec. 6, par. 8, p. 436.

No executive order has been called to our attention and we think there is none to the effect that for the duration of the present war all suits against carriers engaged in interstate commerce must be brought in the county or district where the plaintiff resides at the time of the accrual of the cause of action or in the county or district where the cause of action arose.

As it affected transportation systems then under federal control, General Order No. 18, and its amending Order No. 18-A, was issued in 1918 by W. G. McAdoo, Director General of Railroads, requiring all suits against carriers while under federal control to be brought in the county or district where the plaintiff resided at the time of the accrual of the cause of action or in the county or district where the cause of action arose.

"The President, in time of war, is empowered, through the Secretary of War, to take possession and assume control of any system or systems of transportation, or any part thereof, and to utilize the same, to the exclusion as far as may be necessary of all other traffic thereon, for the transfer or transportation of troops, war material and equipment, or for such other purposes connected with the emergency as may be needful or desirable." 10 U. S. C. A., sec. 1361, 11 F. C. A., sec. 1361.

"The transportation of troops, munitions of war, equipments, military property, and stores throughout the United States, shall be under the immediate control and supervision of the Secretary of War and such agent as he may appoint." Ibid, section 1363.

"The Quartermaster General, under the authority of the Secretary of War, shall be charged with the * * * operation of utilities; * * * with the transportation of the Army by land and water, including the transportation of troops and supplies by mechanical or animal means; with the furnishing of means of transportation of all classes and kinds required by the Army; and with such other duties not otherwise assigned by law as the Secretary of War may prescribe." Ibid, section 72.

As we construe sections 1361 and 1363, above quoted, and as we understand the opinion in *Missouri Pacific R. Co. v. Ault,* 256 U. S. 554, 41 Sup. Ct. 593, 65 L. Ed. 1087, the President, through the Secretary of War, is thereby authorized to exercise his control of any system or systems of transportation merely through supervision of the owner companies although during the first world war complete control was exercised through the offices of a director general.

■ We think, therefore, that the President through the Secretary of War would be warranted in making an order restricting the venue of suits against carriers under general control, either complete or supervisory, while such carriers were engaged in transporting troops, munitions or military supplies, if and when, in the judgment of the President, the practice reflected in plaintiffs' complaints was prejudicial to the just interests of the government in the prosecution of the war. *Alabama & Vicksburg R. Co. v. Journey,* 257 U. S. 111, 42 Sup. Ct. 6, 66 L. Ed. 154.

■ We cannot, however, bring ourselves to believe that, even to promote the prosecution of the war effort, in the absence of any such order a state court of one state may enjoin the continuance of litigation pending in the court of another state where venue is expressly given to the latter by an act of congress.

We are impressed by the following statement in the opinion of Mr. Justice Reed in the Kepner case. In speaking of the privilege of venue given by section 6 of the Federal Employers' Liability Act, that learned and distinguished jurist says:

"The privilege was granted because the general venue provisions worked injustices to employees. It is obvious that no state statute could vary the venue and we think equally true that no state court may interfere with the privilege, for the benefit of the carrier or the national transportation system, on the ground of inequity based on cost, inconvenience or harassment."

The Miles case was decided on March 30, 1942, nearly four months after the Japanese attack upon Pearl Harbor and the doctrine of the Kepner case was there applied to a case seeking to enjoin the further prosecution of a case in a state court. We quote from the opinion in the Miles case:

"The permission granted by Congress to sue in state courts may be exercised only where the carrier is found doing business. If suits in federal district courts at those points do not unduly burden interstate commerce, suits in similarly located state courts cannot be burdensome. As Congress has permitted both the state and federal suits, its determination that the carriers must bear the incidental burden is a determination that the state courts may not treat the normal expense and inconvenience of trial in permitted places, such as the one selected here, as inequitable and unconscionable."

We cannot subscribe to the principle that upon the sole ground of military expediency while a war is in progress the civil courts should be held to have the right and to be charged with its attendant duty to intrude their judgment with respect to the necessity or advisability of suspending the operation of the provisions of an act of congress. We think that in time of war such a course would be an encroachment upon the prerogative of the Commander in Chief of the military forces.

The authorities, cited by respondent, the plaintiff herein, to the point that the right of the plaintiff to defend itself against the defendants' damage claims and to be heard upon the issues of fact involved in those claims is guaranteed by the constitution, do not consider or decide the question before us.

*Washington ex rel. O. R. & N. Co. v. Fairchild,* 224 U. S. 510, 32 Sup. Ct. 535, 56 L. Ed. 863, held an order of a state railroad commission requiring trackage connections at certain points between competing railway companies for the interchange of business to be invalid under the due process of law clause of the 14th amendment of the constitution where the commission acted without any evidence of inadequate service, with no proof of public complaint or of a public demand, with no testimony that any freight had been offered in the past for shipment between those points and with no proof as to the volume of business at any of those points, nor the amount of freight that would be routed over the track connections, if they were constructed, and with no testimony as to the probable revenue that would be derived from the use of the track connections or in the saving in freight or otherwise that would result to the shippers. It was further held that the presumption

of the due performance of official duty and that of the presumably adverse nature of evidence withheld by the party having the power to produce it were not available to support the order of the commission, because the witnesses for the railroad confirmed what had been stated by those for the commission and testified that there had been no demand for track connections and that there was no necessity to put them in and for the further reason that the company was not permitted to offer additional testimony for the purpose of establishing its defense since the statute declared that the validity of the order was to be determined by the court on what had been proved before the commission.

It is here that we find a pertinent principle applying to presumptive proof pleasingly though paradoxically presented by the last proposition in the penultimate paragraph of the opinion thus:

> "The insufficiency of the evidence submitted to the commission could not, under this statute, be supplied on the judicial review by a presumption arising from the failure of the carrier to disprove what had not been established."

In *Coe v. Armour Fertilizer Works*, 237 U. S. 413, 35 Sup. Ct. 625, 59 L. Ed. 1027, Section 2677, General Statutes of Florida (1906) amended by Florida Laws 1909, chap. 5892, as construed and applied by the court of Florida, was held to be repugnant to the "due process of law" provision of the 14th amendment. That section of the Florida statutes provided in effect, if upon issuance of an execution against the property or effects of any corporation and "there cannot be found whereon to levy", then such execution may be issued against any of the stockholders to an extent equal in amount for so much as may remain unpaid upon their subscription.

The plaintiff in error was a stockholder upon whose property a formal levy was made pursuant to an execution issued supplementary to a former execution issued against the property of the corporation in which he was a stockholder a *nulla bona* return having been made as to the corporation.

We think that the foregoing outline of these two authorities, cited by plaintiff, discloses that they afford no support to plaintiff upon the controlling question before us, namely, whether the exigencies of the war effort authorizes a state court to enjoin the further prosecution of litigation based upon the Federal Employers' Liability Act and pending in the state court of another state.

Plaintiff also cites *Davis v. Farmers' Co-op. Equity Co.*, 262 U. S. 312, 43 Sup. Ct. 556, 67 L. Ed. 996; *Michigan Central Railroad Co. v. Mix et al.*, 278 U. S. 492, 49 Sup. Ct. 207, 73 L. Ed. 470 and *Denver & Rio Grande Western R. Co. v. Terte*, 284 U. S. 284, 52 Sup. Ct. 152, 76 L. Ed. 295.

These last named cases are cited to the point that a claimant's privilege of choosing the venue for an action under the Federal Employers' Liability Act cannot be so exercised as to constitute a direct and substantial burden on interstate commerce or to seriously prejudice the public interest.

The doctrine of *Davis v. Farmers' Co-op. Equity Co.*, supra, is that section 7735 of Minnesota General Statutes (1913), as construed and applied by the courts of Minnesota, was in conflict with the commerce clause of the federal constitution (Art. 1, sec. 8, United States Constitution) which, *inter alia*, gives the congress

power to regulate commerce among the several states. Said section 7735 provides:

"That any foreign corporation having an agent in this state for the solicitation of freight and passenger traffic or either thereof over its lines outside of this state, may be served with summons by delivering a copy thereof to such agent."

The Atchison, Topeka & Sante Fe Railway Company was a Kansas corporation, engaged in interstate transportation. It did not own or operate any railroad in Minnesota, but it maintained there an agent for solicitation of traffic. Suit was brought in a court of Minnesota by the Farmers' Co-op. Equity Company, another Kansas corporation, against the plaintiff in error, the Director General of Railroads, as agent, on a cause of action arising under federal control. The Federal Employers' Liability Act was not applicable. No congressional enactment was in anywise construed or considered. Whether said section 7735 of the Minnesota General Statutes, as construed and applied by the Minnesota courts, violated the federal constitution was the only question decided.

In *Michigan Central Railroad Co. v. Mix et al.,* supra, it was held that merely soliciting business by the carrier in the state of Missouri, when no part of its line ran into Missouri and its only purpose of maintaining an office there was to solicit business, did not render valid the service of summons upon the carrier's agent in charge of its Missouri office nor confer jurisdiction upon the state court of Missouri to entertain an action for damages, because of the death in Michigan of a switchman employed by the carrier. The distinction between this case and the cases at bar is clearly drawn in the case of *Denver & Rio Grande Western Railroad*

*Co. v. Terte,* supra. There two carriers, The Sante Fe and the Rio Grande, were sued in the circuit court of Jackson County, Missouri, under the Federal Employers' Liability Act to recover for personal injuries sustained at Pueblo, Colorado.

The Rio Grande was a Delaware corporation and operated lines wholly in Colorado, Utah and Mexico; but it neither owned nor operated any line in Missouri. It did own some property in Missouri and it maintained offices and employed agents to solicit traffic. Under the rule approved in *Michigan Central Railroad Co. v. Mix et al.,* supra, the United States Supreme Court held that the Rio Grande properly claimed exemption from suit in Jackson County.

The Sante Fe was a Kansas corporation, owning and operating railroad lines in Missouri, Kansas, Colorado and other states. It was licensed. It had an office and agents in Jackson County who transacted the business ordinarily connected with the operation of a carrier by railroad. The Supreme Court of the United States held that the Supreme Court of Missouri committed no error of which the federal court could take notice, by refusing to prohibit further prosecution of the action against that company. .

■ The decrees of the circuit court from which these appeals have been prosecuted are and each of them is reversed and these causes are remanded with directions to the circuit court to enter orders sustaining defendants' demurrers to plaintiffs' complaints and for such further proceedings as may not be inconsistent herewith. It is further ordered and decreed that neither party recover their costs or disbursements upon these appeals.

Petition for rehearing denied and opinion modified March 14, 1944

ON PETITION FOR REHEARING

(146 P. (2d) 769)

KELLY, J.

■ In these cases petitions for rehearing have been filed by plaintiff urging the same grounds as those stated in its original briefs and upon oral argument and based upon the same authorities. The court adheres to its former opinion and the petitions for rehearing are denied.

Accompanying said petitions for rehearing are alternative petitions asking that in the event plaintiff's petitions for rehearing are denied, the concluding paragraph of the original opinion and the decree and mandate based thereon be amended so that the same may show that the decision of this court is a final adjudication of the rights of the respective parties and requires the circuit court, after sustaining defendants' demurrers to respondent's complaints, to dismiss these suits.

It being expressly stated by plaintiff-respondent that it could not by any amendment of such complaints state a cause of suit which would withstand a general demurrer based upon the decision of this court, it is therefore ordered that the concluding paragraph of the original opinion be and the same is amended to read:

"The decrees of the circuit court from which these appeals have been prosecuted are and each of them is reversed and these causes are remanded with directions to the circuit court to enter orders sustaining defendants' demurrers to plaintiff's complaints and dismissing said suits and each of them."

It is further ordered that issuance of mandates herein be withheld until March 30, 1944.